## FLUTTER *v.* THE NEW YORK, CHICAGO AND ST. LOUIS RAILROAD COMPANY.

[No. 3,311.   Filed Jan. 25, 1901.   Rehearing denied Oct. 31, 1901.]

APPEAL AND ERROR.—*Verdict.—Interrogatories.*—All obscurity in the special findings and all conflicts between the different findings must be resolved in favor of the general verdict, and no answer can be given broader effect than its words, strictly construed, require. *p. 519.*

MASTER AND SERVANT.—*Railroads.—Verdict.—Interrogatories.*—In an action against a railroad company for injury to a brakeman, a finding by the jury that the general system or plan of the interlocking switch plant at which plaintiff was injured was like the general systems or plans on other railroads with which plaintiff was acquainted was not necessarily in conflict with the general verdict for plaintiff.   *p. 519.*

SAME.—*Railroads.—Contributory Negligence.*—In an action by a brakeman against a railroad company for injuries caused by tripping over wires stretched near the ground running from a semaphore while running along the side of a moving locomotive holding on to the flagstaff socket to assist him in running, the jury found that plaintiff was furnished a book of rules, with which he became familiar, by which employes were forbidden to hang on moving cars, and making it the duty of all train and engine men to familiarize themselves with the peculiarities and dangers upon the points of the line.   *Held,* that it cannot be determined as a matter of law that plaintiff through the violation of any of defendant's rules was guilty of contributory negligence.   *pp. 518-520.*

SAME.—*Railroads.—Contributory Negligence.—Verdict.—Interrogatories.*—In an action by a brakeman for injuries received while engaged in switching cars by tripping over wires about seven inches from the ground used in connection with an interlocking switch device, the jury found in answer to interrogatories that plaintiff was running along the side of a locomotive, holding on to the flag-

staff socket at the time of his injury; that the box and wires were in full view; that plaintiff was in full possession of all of his senses, and was an experienced railroad man; that he did not know the wires were not boxed.  *Held*, that there is nothing in the special findings to forbid the conclusion by the jury that defendant had a right to assume that his path was not rendered dangerous by means of wires stretched across it at such a distance from the ground that a person properly intent upon his duty was liable to be tripped thereby.  *p. 520.*

APPEAL AND ERROR.—*Judgment on Special Findings.*—*Reversal.*—*New Trial.*—Where a judgment rendered on the special findings, notwithstanding the general verdict, is reversed on the ground that the general verdict is not so antagonized by the special findings that they cannot be reconciled, a new trial should not be ordered, since the court cannot assume that any facts exist or can be proved which ought to lead to a different general verdict except such as are specially found in answers to interrogatories.  *pp. 521, 522.*

From Allen Superior Court; *Edward O'Rourke,* Special Judge.

Action by Charles F. Flutter against the New York, Chicago & St. Louis Railroad Company for damages for personal injuries.  From a judgment for defendant on answers to interrogatories notwithstanding the general verdict, plaintiff appeals.  *Reversed.*

*L. M. Ninde, D. B. Ninde, H. W. Ninde, L. J. Ninde, W. J. Vesey* and *O. N. Heaton,* for appellant.

*R. C. Bell, W. D. Doughman, J. H. Clarke* and *W. Olds,* for appellee.

BLACK, J.—A general verdict in favor of the appellant against the appellee for $3,000 was returned with special findings of the jury in answer to interrogatories.  The court sustained the appellee's motion for judgment in its favor upon the special findings, notwithstanding the general verdict.  This action of the court is presented for review.

The action was one for the recovery of damages for a personal injury suffered by the appellant, while serving in the employment of the appellee, through the alleged negligence of the appellee which rendered unsafe the place in

which the appellant was working. In the general verdict was included necessarily the jury's finding that the appellant was injured as alleged, through the negligence alleged of the appellee, without contributory negligence on the part of the appellant, the risk of danger not having been assumed by him, and that he was damaged in the amount awarded by the verdict.

Unless there is inconsistency between the general verdict and the special findings in some material matter, the findings can not control. The rules applicable in the comparison of the special findings with the general verdict for the purpose of determining the question whether or not they are irreconcilable have been stated very often, and we will now concern ourselves only with their application.

In answer to interrogatories the jury found, that the appellant was an able-bodied man thirty-one years old, who for ten years last past had the full use of his senses, seeing and hearing; that in 1886 he entered the employ of the Pennsylvania Company as a brakeman on one of its freight trains, and continued in such service two months or more; that in November, 1887, he entered the employ of the Grand Rapids and Indiana Railroad Company as a brakeman on its freight trains, and continued in its employ as a brakeman or conductor for about seven years, and after leaving its employ entered the employ of the Wabash Railroad Company and remained in the employment of that company as a brakeman or conductor upon its freight train for two years; that he entered the employ of the appellee as brakeman on one of its freight trains in January, 1897, and continued in its employment until the time of his injury (which in the complaint was alleged to have occurred on the 23rd of November, 1897); that there was an interlocking switch plant in use on the Pennsylvania Company's road when he was in its employ, and five interlocking switch plants in use on the road of the Grand Rapids and Indiana Railroad

Company when he was in its employ, and there were in use on the Wabash Railroad while he was in that company's employ interlocking switch plants at Clymers, Huntington, the Muncie crossing and New Haven; that there were in use on the road of the New York, Chicago and St. Louis Railroad Company (the appellee), when he entered its employ and during the time he was employed by it, interlocking switch plants at Lockwood, Hammond, New Haven and West Leipsic; that the appellant, while in the employ of the Pennsylvania Company, had occasion to use an interlocking switch plant on its line, and while in the employ of the Grand Rapids and Indiana Railroad Company as brakeman and conductor on its freight trains, during all of the time he was employed by that company, went through and by the places where were the different interlocking switch plants heretofore described, and while in the employ of the Wabash Railroad Company he had occasion to use and pass along the different interlocking switch plants heretofore designated; that before he entered the employ of the appellee, while in the employment of the Pennsylvania Company, the Grand Rapids and Indiana Railroad Company and the Wabash Railroad Company, in the performance of his duties as an employe of said railroad companies, he had occasion to use, handle and become familiar with the several interlocking switch plants located on said roads; that the interlocking switch plants on the railroad of the appellee were of the same kind and character as those that were operated and used on the Wabash Railroad and the Grand Rapids and Indiana Railroad; that the appellant, while in the employ of the appellee, had occasion to use and become familiar with the different interlocking switch plants heretofore named on appellee's railroad; that at the time he entered the employ of the appellee, he was familiar with the manner in which the interlocking switch plants on appellee's railroad were constructed; that the tower station by the interlocking switch plant at New Haven was situated at and

about a point where the Wabash Railroad Company's tracks cross the appellee's tracks; that there was a distant signal upon what is called a semaphore about 1,600 feet east of this tower station, and situated between the tracks of the Wabash Railroad Company and the appellee's tracks, and about fifteen feet from the main track of appellee's road; that at the point where this semaphore was situated, running between appellee's road and the Wabash road, there was a transfer track about five or six feet from the semaphore; that there were south of the semaphore the main track, or passing track, and switch track number one and switch track number two of the appellee's railroad; that there were two wires running from the distant semaphore south across the different tracks of the appellee's road to a box containing some pulleys about four feet south of the switch track number two, and these wires continued from the pulleys in the box along the south side of the appellee's railroad tracks to the tower station, and these wires were used to operate the signals on the semaphore; that the box in which were the pulleys was about two feet square, and this box was about thirty feet from the semaphore; that the wires where they left this box extending toward the semaphore, for a distance of about four feet, were about seven inches above the ground, and were extended from this box toward the tower station throughout the whole distance considerably above the ground and in plain view; that the wires for the entire distance from the box with the pulleys over to the semaphore were exposed and in full view; that there was a switch which connected switch track number one to switch track number two about thirty-one feet west of this box; that there was nothing to prevent a person operating this switch from seeing the wires as they extended eastward from the switch to this box and then crossed the tracks over to the semaphore, which was an object that could be seen for a mile or more; that a person standing on any one of the tracks of the appellee where the wires crossed from the box

over to the semaphore could see the wires the entire distance from the box to the semaphore; and a person riding along on the appellee's main track could see the box and the wires connecting therewith running in each direction; that the appellant passed along between the box and the semaphore more than one hundred and fifty times; that the place where the appellant tripped and fell was where the wires extended from the box containing the pulleys over to the south rail of track number two, and the distance between the box and the south rail of track number two was about four feet, and the wire over which the appellant tripped was about seven inches above the ground; that the place where he tripped was about seventeen feet from the center of the main track of the appellee's railroad and about eight feet from the center of switch track number one, and about four feet from the center of switch track number two; that appellant had frequently done switching over track number two, and had frequently thrown the switch connecting track number two with track number one, and had frequently done switching on track number one, and had frequently done switching on the transfer track between the Wabash and the Nickel Plate roads; that there was a distant semaphore on the Wabash road situated within one hundred feet of the distant semaphore of the appellee; that there were wires connecting the distant semaphore of the Wabash and running along between the Wabash and the Nickel Plate tracks within twenty feet of the main track of the Nickel Plate for a considerable distance toward the tower station; that the appellant, before his injury, had frequently seen the wires connecting the distant semaphore of the Nickel Plate with the tower station, and he had had the opportunity of knowing that the wires connecting the distant semaphore of the Nickel Plate with the tower station were not boxed. Q. 54. "Did not the plaintiff for some time prior to his injury know that the wires over which he tripped were not boxed? A. No." Q. 55. "Did not the plaintiff have

the opportunity of knowing for three months prior to his injury that the wires over which he tripped were not boxed? A. No." The next question and answer (not numbered) were as follows: "If you answer the above interrogatory no, state why he did not. A. Because he never worked over on the south side before." Q. 56. "Was not the plaintiff familiar with the location of the, and the manner in which they were constructed, where the same connects the tower station with the distant semaphore on defendant road? A. No." It was further found, that the interlocking switch plant at New Haven was constructed in the same manner as interlocking switch plants are usually constructed upon good railroads; that it is not customary on railroads generally not to box the wire connecting the semaphore with the tower station; that they were boxed on the Grand Rapids and Indiana Railroad at Kendallville, Indiana, and at Huntington, Indiana, on the Wabash Railroad; that the wires connecting the tower station with the semaphore at New Haven, where the appellant was injured, were constructed in the same way in which they are on standard railroads of the country; that the interlocking switch plant at New Haven, including the wires connected with the distant semaphore, was constructed in the same manner as all other interlocking switch plants on the appellee's railroad; that the appellant at the time he was injured was running along the side of a moving locomotive, having in one hand a lantern that was lighted; that he was employed as head brakeman on one of the appellee's trains that arrived at New Haven about 8 o'clock in the evening; that he received orders while at New Haven, in company with the rear brakeman on said train, to take a car off track number three and put it in the train on which he was employed; that the engine which drew the train started to go in on track number three; that the appellant at the time the engine started to go eastward on track number three was in the rear of the engine; that when the engine started east to go in on track number three the appel-

lant ran along the south side of track number two and along by the side of the engine up to the front of the same, and while running along the side of the engine he took hold of the flag-staff socket to assist him in running, having in his other hand at the time a lighted lantern; that he was running and holding on to the flag socket or staff of the engine at the time he tripped and fell; that it was the purpose of the appellant when he took hold of the flag staff to enable him to run faster and keep up with the engine; that he intended, while having hold of the socket of the flag staff, to jump on the front of the engine; that he was not looking where he stepped while he was running; that while running he did not see the box that contained the pulleys over which the wires were operated, connected with the distant semaphore, over which he tripped; that at the time he tripped over the wires he was looking ahead and paying no attention to where he stepped; that at the time he entered the employ of the appellee he received a book of rules and regulations and was directed to follow these rules and be governed by them; that one of these rules was as follows: "Stepping upon the front of approaching engines, jumping on or off trains or engines while in motion, going between cars in motion to uncouple them, hanging upon or leaning out from the sides of moving cars or engines, riding upon the top of unusually high cars and all similar acts, are imprudent and hazardous and expose persons committing them to extraordinary danger. All such acts are therefore forbidden, and employes are warned if they commit them it will be at their own peril and risk." Another of these rules was as follows: "The company does not wish or expect its employes to incur any risk whatever from which by the exercise of their own judgment and by personal care they can protect themselves, but enjoins upon them to take time in all cases to do their duty in safety, whether they may at the time be acting under orders of their superiors or otherwise." Another of these rules was as follows: "Train and engine men must famil-

iarize themselves with the peculiarities and dangers upon the points of the line." Another of said rules was as follows: "All persons entering into or remaining in the service of this company are warned that in accepting or retaining employment they must assume the risk attending it." It was found that the appellant read and became familiar with these rules; that he had in his possession a book containing these rules from the time he entered the employ of the appellee until he was injured. Q. 84. "Was not the plaintiff at the time he was injured acting on his own volition? A. No, he was in the act of performing his duty at the time." Q. 84½. "If you answer the above interrogatory no, state who told him to do what he did. A. His conductor." Q. 85. "Was there any reason at the time plaintiff was injured why he should hurry or take any risk? A. No." Question (not numbered). "If you answer the above interrogatory yes, state who hurried him. A. No."

All obscurity or want of certainty or directness in the special findings and all contradictoriness between the different special findings must be resolved in favor of the general verdict. No answer can be given broader effect than its words strictly construed require. No intendment can be indulged against the general verdict.

That the general system or plan of the interlocking switch plant at New Haven was like the general systems or plans at any other places or on any other railroad with which the appellant was acquainted, was not necessarily inconsistent with the conclusion of the jury in the general verdict that there was a negligent failure on the part of the appellee to provide a reasonably safe place for the work which the appellant had to perform in the discharge of his duty as an employe in switching cars at night, and that the appellant had not assumed the risk of the danger from the wires so stretched across the course which his duty required him to take in the proper prosecution of his work, and that he did not by his own negligence directly contribute to his injury.

We can not as a matter of law determine that the appellant through violation of any of the salutary suggestions contained in the rules of the appellee for the guidance of its employes was guilty of contributory negligence, or that he assumed this particular risk. It does not appear that at the time of his injury he had made any attempt, or that when injured he was making an attempt to get upon the locomotive. The speed of the locomotive or that of the appellant is not shown, and we can not say that there was negligence as a matter of law on the part of the appellant in holding with his left hand to the socket of the flag staff as he went forward beside the engine. Indeed, leaving out of consideration the presence and peculiar situation of the wires in his path, of which he had no knowledge, we can not say that, in view of other circumstances which were or might be in evidence, the jury could not properly conclude that it was entirely consistent with ordinary prudence for the appellant to thus assist himself. In consideration of the well defined difference between the duty of the master who has himself made the working place to inspect it and to see that it is reasonably safe in view of the use to which it is to be put, on the one hand, and the obligation of the servant to use his opportunities to learn the dangers of his employment on the other hand, it can not be said that the employe and the employer were in this case shown by the special findings to be upon an equal footing, or that the danger was equally open to the observation of the employe and the employer. It is not manifest that the jury were bound to conclude that the appellant had actual or imputed knowledge of the risk of danger. There is nothing in the special findings to forbid a conclusion by the jury that the appellant had a right to assume that his path was not rendered dangerous by the railroad company by means of wires stretched across it at such a distance from the ground that a person properly intent upon his duty was liable at night to be tripped thereby.

The interrogatories bear indications of considerable skill in the preparation, but there is room between the lines for reading in supposable evidence which would render the special findings not irreconcilably inconsistent on any material point with the general verdict.

There is nothing, we think, in the special findings to force the conclusion that the material questions in the cause on trial were not all properly determined by the general verdict.

In the brief for the appellee it is suggested, in effect, that if it be determined that the judgment ought to be reversed, we should order a new trial. Learned counsel, of course, would agree that the case is quite different from one involving the consideration of a special verdict or the statement of the facts in a special finding, wherein all material and issuable facts proved on the trial ought to be stated, without recital of mere evidence or the commingling of mere conclusions of law. Here, the general verdict for the appellant includes the finding of all the material facts and the application of the law thereto, as stated, presumably, by the court in its instructions. By the special findings the party submitting the interrogatories, it may be assumed, has placed in contrast with the general verdict all facts shown upon the trial supposed by that party to be inconsistent with a general verdict against such party. The evidence is not before us, and it could not be considered in this connection if it were in the record.

Our duty is to let the general verdict prevail, unless facts in some way irreconcilably inconsistent with it have been specially found. It is true that we may order, and we ought to order, a new trial, if we are satisfied from the record before us that otherwise injustice will be done; but when the question presented by the record and the assignment of errors is simply whether or not the general verdict is so antagonized by the special findings that they can not be reconciled, we can not assume that any facts exist or can be proved which ought to lead to a different general verdict, except

such as we discover to have been specially found in answer to interrogatories.  We must give the special findings the effect intended by the statute under which they have been rendered.

The judgment is reversed, and the cause remanded with instruction to overrule the appellee's motion for judgment in its favor upon the special findings.